UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Paiyam Daniel Hashemi,

                **Plaintiff,**         **Civil Action No. 11-13629**

        **vs.**                  **District Judge George Caram Steeh**

**Commissioner of Social**         **Magistrate Judge Mona K. Majzoub**
**Security,**

               **Defendant.**
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Paiyam Daniel Hashemi has filed this civil action seeking judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security disability and supplemental security income benefits.  (Dkt. 1.)  Before the Court are the parties' motions for summary judgment.  (Dkt. 9, 10.)

      The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Dkt. 3.)  The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.[1]

## I.      Recommendation

      Because the Court recommends finding that the ALJ properly rejected Plaintiff's treating source argument, that substantial evidence supported the ALJ's decision to reject Plaintiff's subjective complaints, that the ALJ appropriately addressed Plaintiff's argument that he could not

---

[1]The Court dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

afford treatment, and that the ALJ did not err when he did not discuss Plaintiff's obesity, the Court recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

## II.     Report

### A.     Facts

#### 1.     Procedural facts

On February 27, 2007 Plaintiff filed an application for child's insurance benefits and supplemental security income benefits.  (AR at 13.)  Plaintiff alleged that he became disabled beginning January 1, 2002.  (*Id.*)  Plaintiff's claims were initially denied on November 20, 2007. (*Id.*)  Plaintiff requested a hearing to review that initial denial; the hearing was held on November 5, 2009.  (*Id.*)  On May 28, 2010 the ALJ denied Plaintiff's request for benefits.  (*Id*. at 10.)  On June 21, 2011 the Appeals Council denied Plaintiff's request for review.  (*Id*. at 1.)  Plaintiff thereafter filed this case for judicial review of that denial.  (Dkt. 1.)

#### 2.     The ALJ's written decision

The ALJ found that Plaintiff had the following severe impairments: asthma; histoplasmosis and granulomous lung disease; and sleep apnea.  (AR at 15.)

The ALJ first discussed how Plaintiff's alleged acute renal failure from 2001 had resolved itself and how, by 2004, Plaintiff's renal function had returned to normal.  (AR at 15.) The ALJ stated that the Plaintiff's alleged renal failure was not a severe impairment.  (*Id*.) The ALJ then discussed Plaintiff's alleged adjustment disorder with depressed mood diagnosis.  (*Id*.)  The ALJ held that there was no evidence of mental health treatment in the record and therefore the adjustment

disorder was not a severe impairment. (*Id.*) The ALJ discussed the Paragraph B criteria and found that Plaintiff had no limitations in the four areas. (*Id.* at 16-17.)

The ALJ stated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (AR at 17.) The ALJ formed the RFC:

> [Plaintiff] has the [RFC] to perform light work . . . with the following additional limitations: occasional climbing of stairs and ramps; occasional kneeling, balancing, stopping, crouching, crawling; no climbing of ladders, ropes, or scaffolds; avoid even moderate exposure to unprotected heights and moving machinery; and avoiding dust, fumes, and gases.[2]

(*Id.*)

The ALJ discussed Plaintiff's pain allegations in his application, appeal, and during his testimony at the hearing. (AR at 18.) The ALJ stated that Plaintiff reported symptoms that included pain at a 7-8 out of a 10 level scale. (*Id.*) The ALJ stated that Plaintiff said this pain was in his chest, back, and legs. (*Id.*) The ALJ also stated that Plaintiff reported: fatigue requiring daily naps; monthly seizures; short-term memory loss; disrupted sleep; and breathing difficulty. (*Id.*) The ALJ also noted that Plaintiff stated that he needed help bathing, that he sat and watched television all day, and that he could read but that he had difficulty seeing. (*Id.*) The ALJ further noted that his symptoms adversely affected his ability to perform activities such as walking or lifting. (*Id.*) The

---

[2]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighting up to 10 pounds. Even though the weight lifted may be very little, a job is in the category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

ALJ stated that Plaintiff said he could only walk for ten minutes, only lift up to ten pounds, and that climbing stairs, reaching, squatting, and bending caused him extreme pain and fatigue. (*Id*.)

The ALJ then stated that Plaintiff's allegations were not "wholly credible because they are not supported by the objective medical evidence or by [Plaintiff's] reported daily activities and admitted abilities." (AR at 18.) The ALJ then reviewed the evidence he found supported his finding that Plaintiff was not disabled. (*Id.*)

The ALJ noted that Plaintiff had a history of pulmonary histoplasmosis. (AR at 18.) The ALJ reviewed Dr. Daniel Murray's findings that Plaintiff had a history of presenting complaints of shortness of breath–diagnostic testing and a biopsy revealed histoplasma. (*Id*. at 19.) The ALJ noted that, since the diagnosis, Plaintiff had episodes of chest pain, "primarily upon exertion," "which precluded significant physical activity and toleration to environmental pollutants and allergens. (*Id.*)

The ALJ noted that Plaintiff was diagnosed with sleep apnea and asthma. (AR at 19.)

The ALJ then noted that Plaintiff was referred to Dr. Franklin Rosenblat, in 2006, for an evaluation of granulomatous lung disease. (AR at 19.) The ALJ recounted that Dr. Rosenblat found that Plaintiff's lung nodules were benign. (*Id*.) The ALJ found that, "despite this history, the medical evidence of record reveals no medical relevance, such as a change or worsening of [Plaintiff's] condition, as of the alleged onset date of disability." (*Id*.) The ALJ stated that Plaintiff's treatment record and objective clinical findings were not consistent with what one would generally expect of a totally disabled individual. (*Id*.) The ALJ explained that there was a gap in Plaintiff's treatment with Dr. Rosenblat from August 2006 until March 27, 2007. (*Id*. at 19.) The ALJ noted that, as of March 2007, Dr. Rosenblat reported that Plaintiff failed to keep his follow up appointments. (*Id*.) The ALJ reasoned that this failure to keep appointments indicated that

4

Plaintiff's symptoms were not as severe as alleged. (*Id.*) While the ALJ noted that Plaintiff stated

that this gap was due to depression, the ALJ found no mental health records. (*Id.*) The ALJ also

pointed out that, despite Plaintiff's complaints of increasing chest pain and shortness of breath, Dr.

Rosenblat found that Plaintiff was in no respiratory distress, and "further stated that [Plaintiff's]

histoplasma serology and histoplasma urine antigen were negative." (*Id.*) The ALJ then pointed out

that Dr. Rosenblat suggested that Plaintiff's symptoms were possibly related to a granulomatous

process. (*Id.*)

   The ALJ reviewed that, in April 2007, Plaintiff reported worsening overall chest pain. (AR

at 19.) The ALJ noted that biopsy results were negative for malignancy, but that granulomas were

detected. (*Id.*) A May 2007 follow up showed that Plaintiff's mother expressed concerns about

Plaintiff's reported pain, but Dr. Rosenblat noted that Plaintiff appeared "nontoxic, in no distress,

with no complaints of pain or apparent discomfort." (*Id.*) The ALJ noted that records show that

Plaintiff threw away his medication, alleging that it was not helping his symptoms. (*Id.*) Dr.

Rosenblat referred Plaintiff to his primary care physician for care. (*Id.*)

   The ALJ noted that the next record was from July 2007, when Plaintiff visited Dr. Daniel

Maxwell for the first time in just about one year. (AR at 19.) The ALJ stated that Dr. Maxwell

reported that Plaintiff failed to undergo the recommended polysomnography and CPAP titration.

(*Id.*) The ALJ also noted that Plaintiff told Dr. Maxwell that he did not have a problem with sleep

apnea and that his chest pain was not exertional. (*Id.*) The ALJ found that this statement was

inconsistent with descriptions in the record. (*Id.*) And the ALJ found that Plaintiff reported that he

was not taking any medications, which the ALJ found suggested that Plaintiff's symptoms were not

as severe as he had alleged. (*Id.*) The ALJ pointed out that Dr. Maxwell found that Plaintiff was

5

in no acute cardiopulmonary distress, "with clear lungs to auscultation and 99% oxygen saturation." (*Id.* at 20.) The ALJ noted that Dr. Maxwell stated that, based upon Plaintiff's histology and culture results, Plaintiff did not have an active infection, but "simply residual granulomatis disease." (*Id.*) The ALJ noted that Dr. Maxwell assessed that Plaintiff had moderate, persistent asthma and recommended polysomnography, which demonstrated "severe, complex sleep apnea." (*Id.*) But the ALJ pointed out that, as of July 2007, Dr. Maxwell stated that Plaintiff's "complaints of ongoing and unremitting chest pain did not 'seem to be causing him significant difficulty in his activities of daily living.'" (*Id.*) The ALJ further pointed out that Dr. Maxwell noted that Plaintiff  was not utilizing his asthma medication as recommended. (*Id.*) A September 2007 record, the ALJ stated, showed that Plaintiff was utilizing his CPAP nightly and tolerating it satisfactorily. (*Id.*)

The ALJ then discounted Plaintiff's allegations of seizures because the medical records did not support Plaintiff's seizures, although the ALJ did point out that Plaintiff reported seizures to Dr. Gina Gora in July 2008. (AR at 20.)

The ALJ then explained Dr. Gora's opinion and why he felt that it deserved little weight. (AR at 20.) The ALJ recounted that Dr. Gora limited Plaintiff to "only occasionally lifting up to 10 pounds, and further to standing/walking less than 2 hours in an 8-hour workday, and sitting less than 6 hours in an 8-hour workday." (*Id.*) The ALJ noted that Dr. Gora imposed no mental limitations. (*Id.*) The ALJ then stated

> [t]his opinion is given little weight, because there is no internal support, nor support from the remainder of the medical evidence of record, for Dr. Gora's opinion; moreover, her treating relationship with [Plaintiff] appears to be very short as of this statement, obviously rendering it less persuasive.

(*Id.*)

The ALJ then reviewed Dr. Pamela Herringhow's psychological examination, which the ALJ

6

stated showed that Plaintiff had been making inconsistent statements about his symptoms.  (AR at 20.)  The ALJ reasoned, "[a]lthough the inconsistent information provided by [Plaintiff] may not be the result of a conscious intention to mislead, nevertheless the inconsistencies, as seen throughout the record, suggest that the information provided by [Plaintiff] may not be entirely reliable."  (*Id.*)

The ALJ reviewed Plaintiff's statements of his daily activities, which the ALJ found were not "limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (AR at 20.)  The ALJ pointed out that Plaintiff had no difficulty tending to personal care; handling personal chores, including taking out the trash; shopping; driving; and using the computer.  (*Id.* at 20-21.)  The ALJ accepted that Plaintiff's activity level had reportedly diminished, in terms of hobbies and sports, but the ALJ noted that the evidence generally indicated that Plaintiff retained greater abilities than he alleged.  (*Id.* at 21.)

The ALJ also considered Plaintiff's failure to follow up with his treatment, including testing and medication, as recommended by his doctors.  (AR at 21.)  The ALJ reasoned that this failure showed symptoms less severe than alleged.  (*Id.*)  The ALJ then pointed out that, aside from Dr. Gora's opinion, the opinions of record showed that Plaintiff was not significantly limited due to his symptoms.  (*Id.*)  The ALJ additionally pointed out that the gaps in Plaintiff's treatment indicated that Plaintiff's condition was not that of a totally disabled individual.  (*Id.*)

The ALJ discussed Plaintiff's argument that the reason he did not have consistent treatment was that he lacked insurance.  (AR at 21.)  The ALJ discredited the argument.  (*Id.*)

The ALJ reviewed the vocational expert's testimony given at the hearing, noted that the vocational expert testified that there were jobs in the economy that someone with Plaintiff's RFC could do, and then directed a finding of "not disabled."  (AR at 22.)

7

### 3.    November 5, 2009 hearing

On November 5, 2009 Plaintiff appeared and testified at his hearing.  (AR at 36.)  Plaintiff testified that he could not work because of his pain level when he asserted himself, fatigue from his sleep apnea, his seizures, and pain in his legs and lower back from a botched spinal tap.  (*Id*. at 41.)  Plaintiff stated that he had pain in his chest, back, knees, and legs.  (*Id*.)  Plaintiff stated that his pain depended on what he was doing and that his pain increased with exertion.  (*Id*. at 41-42.)  Plaintiff testified that getting up to shave or go to the bathroom caused pain.  (*Id*. at 42.)  He added that he could "walk and stuff," but even doing those things caused him some pain.  (*Id*.)  He stated that, since his "botched spinal tap," he had not been able to walk around.  (*Id*.)  He claimed that he had this pain all the time.  (*Id*.)  The pain was so severe, he added, that he had been hospitalized once or twice for it.  (*Id*.)  The pain level, he stated, was seven or eight out of a ten scale.  (*Id*.)  Plaintiff stated that his pain level increased to a nine when walking.  (*Id*. at 43.)

Plaintiff then discussed his fatigue with the ALJ.  (AR at 43-44.)  Plaintiff stated that he could only get three to four hours of sleep at night.  (*Id*. at 44.)  When he experienced his daily fatigue, Plaintiff stated that he would try to sit down and rest.  (*Id*.)  He added that he, at times, would try to lay down and take a short nap.  (*Id*. at 45.)  Plaintiff, after the ALJ pressed the question, stated that he would sleep for around two hours during the day.  (*Id*.)

Plaintiff stated that he experienced seizures, the last one before the hearing, he added, was a month earlier.  (AR at 45.)  He stated that he did not go to the hospital as a result of the seizure because the hospital could not give him the medicine he thought he needed or an explanation.  (*Id*. at 46.)  He stated that he suffered more serious seizures once per month and then smaller seizures once a week or so.  (*Id*.)  His big seizures, he stated, made him black out and lasted about a half of

8

an hour.  (*Id*. at 47.)  But he stated that he never went to the hospital for his seizures.  (*Id*.)  He did

state that he experienced a seizure at a doctor's office and then went to the hospital, but he was not

sure of which hospital.  (*Id*.)

The ALJ pressed Plaintiff to state why he believed he could not work.  (AR at 48.)  Plaintiff

testified that he could not work because of the pain he experienced.  (*Id*.)

Plaintiff testified to his alleged limitations.  Plaintiff was using a cane at the hearing, that he

stated was prescribed for his mother.  (AR at 49.)  He stated that he could lift ten pounds but not for

a very long distance.  (*Id*.)  He stated that he could sit for about a half of a hour or forty-five minutes

before his back started hurting and he had to stand up.  (*Id*.)  He testified that he could stand for

"maybe" an hour or two before he had to sit down and rest.  (*Id*. at 50.)  He also testified that he

could walk "maybe" half of a block before he experienced fatigue and pain.  (*Id*.)  Plaintiff stated

that he could bend down and pick something up off of the floor, but that that bending did cause him

some pain and that he could not pick something up repeatedly.  (*Id*.)  He stated that he could not

kneel, because his knees would start swelling because of his back.  (*Id*.)  Because his kneels swelled

up, Plaintiff stated, he experienced a lot of pain and could not stoop or crouch down.  (*Id*. at 51.)

He stated that he could not crawl, because his back would not "take it."  (*Id*. at 52.)  Plaintiff stated

that he did not have any problems handling items or carrying items or using his hands or fingers.

(*Id*.)  He did state that smoke bothered him.  (*Id*.)

Plaintiff then explained his normal day.  (AR at 52.)  He explained that he watched

television. (*Id*.) He stated that he had problems dressing and bathing and shaving, because he could

not stand for very long.  (*Id*.)  He stated that he could prepare simple meals for himself.  (*Id*. at 53-

54.)  He testified that he could not do any chores around the house because he could not lift or clean

9

anything, due to fatigue and pain.  (*Id*. at 53.)

After Plaintiff's counsel questioned Plaintiff, the ALJ posed several hypothetical questions to the vocational expert.  (AR at 69.)

### 4.   Record evidence

On July 13, 2006 Plaintiff filled out a function report.  (AR at 143.)  Plaintiff described his daily activities.  (*Id.*)  He wrote that he usually woke up at 10 a.m.  (*Id.*)  He reported that he was in a lot of pain when he wakes up and that it took him a long time to get out of bed.  (*Id.*)  He then stated that he usually checked on what people were doing around the house and then he would watch television for several hours and then go on the internet for an hour or so.  (*Id.*) After that, he stated, he needed to lie down "due to extreme chest pain."  (*Id.*) He then stated that he ate a small meal and then went to bed. (*Id.*)

On the function report, Plaintiff indicated that his impairments did not affect his ability to: dress; bathe; care for hair; shave; feed self; and use the toilet.  (AR at 144.)  He added that he did not need any help taking care of his personal needs and grooming or taking medicine.  (*Id*. at 145.)

He stated that he could prepare simple meals for himself.  (AR at 145.)  He also stated that he could do his own laundry and light cleaning.  (*Id.*)

Plaintiff reported that his chest pain inhibited basically of all his physical abilities.  (AR at 148.)  Plaintiff stated that he could walk ten minutes before he needed to rest for three to five minutes before he walked again.  (*Id.*)

On February 27, 2007 Plaintiff had a disability report filled out.  (AR at 156.)  The report indicates that Plaintiff was six feet tall and weighed two-hundred and seventy pounds. (*Id.*)  The report also indicates that Plaintiff claimed that his histoplasmosis, short term memory loss, sleep

10

apnea, and pulmonary fibrosis limited his ability to work. (*Id.* at 157.)

Another function report shows that Plaintiff needed his mother to remind him to take his medication. (AR at 166.) The function report also shows that Plaintiff reported that he could take out the trash. (*Id.*) Plaintiff also reported that he could do grocery shopping. (*Id.* at 167.) Plaintiff summarized that his pain limited all his physical abilities. (*Id.* at 168.)

On a second disability report, Plaintiff reported that he had seizures "at least 2 times a day," added that his stomach and spleen hurt constantly, and stated that he had increased chest pain. (AR at 176.) Plaintiff added that the seizures and his increased pain made it extremely hard to walk, sit, lie down, sleep, and stand for any length of time. (*Id.*) On this report he indicated that he had difficulty: going to the restroom, shaving, doing laundry, fixing meals, cleaning, sleeping, exercising, going to doctor appointments, and going outside. (*Id.* at 180.)

In November 2001 Plaintiff had a psychological evaluation performed at St. Francis Hospital and Health Centers. (AR at 331.) The evaluation was performed when Plaintiff was fifteen years old because he alleged that he was having memory problems. (*Id.*) The results were generally unremarkable. (*Id.*)

In December 2001 Plaintiff was admitted to St. Francis Hospital and Health Centers for acute renal failure due to a viral infection and/or ibuprofen. (AR at 202.)

A January 23, 2004 Community Hospitals Indianapolis record shows that Plaintiff was admitted to the hospital. (AR at 283.) The report shows that Plaintiff had histoplasma exposure in 2002. (*Id.*) This 2004 report also shows that Plaintiff did not allege chest pain or any other complaints. (*Id.*) Lab chest x-ray results showed that Plaintiff did have some small nodular changes in his chest. (*Id.* at 284.) The report shows that Plaintiff had a history of vague chest pain and nasal

11

congestion.  (*Id.*)  The report also indicates that Plaintiff was doing "remarkably well and [did] not need any further admission to the hospital."  (*Id.*)  And the report shows that the doctor recommended further outpatient work for his pulmonary nodules, which the doctor suggested was just histoplasma granulomas.  (*Id.*)

On February 11, 2004 Dr. Sunil Gollapudi saw Plaintiff. (AR at 293.)  The doctor noted that Plaintiff's acute renal failure had resolved. (*Id.*)  Dr. Gollapudi noted Plaintiff's history–that Plaintiff went to the emergency room in January for an upper respiratory infection that led to the discovery of multiple pulmonary nodules.  (*Id.*)  Dr. Gollapudi further noted that Plaintiff and his mother stated that the nodules were allegedly a result of his histoplasmosis.  (*Id.*)  The doctor also stated that Plaintiff had back pain, but that the CT scan performed did not reveal any kidney stones.  (*Id.*)

On March 22, 2004 Dr. Gollapudi saw Plaintiff again.  (AR at 290.)  He stated that Plaintiff was awake, alert, oriented, and in no acute distress.  (*Id.*)  Dr. Gollapudi found that there was no evidence of renal artery stenosis, no renal mass lesions, and no hydronephrosis.  (*Id.* at 289.)  Dr. Gollapudi further found that Plaintiff had hypertension.  (*Id.*)  He noted that Plaintiff's hypertension was most likely due to Plaintiff's excess weight.  (*Id.*)  The doctor further noted no evidence of hematuria.  (*Id.*)

A June 27, 2006 Waterford Medical Associate's record shows that Plaintiff had clear lung fields, that his cardiovascular silhouette was within normal limits, and that the hilar and vascular structures were unremarkable.  (AR at 365.)  The report show that Plaintiff did not have any active pulmonary disease. (*Id.*)

A July 2006 record shows that Plaintiff was still reporting constant chest tightness and pain with deep breaths. (AR at 363.) The record also shows that Plaintiff had not yet visited a pulmonologist. (*Id.*) The record indicated that Plaintiff weighed 279 pounds. (*Id.*)

Dr. Irvin Gastman, D.O., saw Plaintiff on August 10, 2006. (AR at 494.) Dr. Gastman explicitly noted that Plaintiff was obese. (*Id.*) Dr. Gastman also noted "[a]typical chest pain with predominately exertional dyspnea, suggestive of reactive airway disease." (*Id*. at 495.)

A March 27, 2007 report by Dr. Rosenblat showed that Plaintiff's last evaluation was in August, 2006. (AR at 436.) Dr. Rosenblat noted that he had recommended that Plaintiff follow up with monthly appointments, but Plaintiff had failed to do so. (*Id.*) Dr. Rosenblat stated that Plaintiff reasoned that depression kept him from his follow up appointments. (*Id.*) Dr. Rosenblat reported that Plaintiff stated that he had an increase in his overall chest pain. (*Id.*) And Dr. Rosenblat noted that Plaintiff said he had an increase in his shortness of breath. (*Id.*) Dr. Rosenblat recommended a biopsy procedure. (*Id.*)

Plaintiff had a biopsy to determine what was causing his chest discomfort and was then discharged into Drs. Rosenblat and Hatahet's care. (AR at 399.)

On May 8, 2007 Dr. Rosenblast saw Plaintiff. (AR at 422.) Dr. Rosenblat noted that Plaintiff did not appear to be uncomfortable or complain of any pain. (*Id.*) Dr. Rosenblat declined further speculation until the biopsy results were in. (*Id.*)

On May 21, 2007 Dr. Rosenblat saw Plaintiff for a followup regarding his granulomatous lung disease. (AR at 421.) Dr. Rosenblat stated that the biopsy results showed that Plaintiff had benign granulomas–they were negative for acid-fast bacilli and fungal elements. (*Id.*) Dr. Rosenblat noted that Plaintiff continued to complain of chest pain. (*Id.*) The doctor noted that Plaintiff was

13

on Tramadol for his pain but that Plaintiff had thrown out a former medication because he stated that it was not relieving his pain at all.  (*Id.*)

Dr. Rosenblat formed the impression that Plaintiff had granulomas that may have resulted from Plaintiff's histoplasmosis (although Dr. Rosenblat noted that there was no definitive previous diagnosis of histoplasmosis).  (AR at 421.)  Dr. Rosenblat also noted that it was his opinion that Plaintiff had no active infection.  (*Id.*)

A July 26, 2007 report from Dr. Daniel Maxwell, D.O., shows that Plaintiff was complaining of ongoing and unremitting chest pain" but Dr. Maxwell further found that this pain did not "seem to be causing him significant difficulty in his activities of daily living."  (AR at 497.)  A July 10, 2007 report shows that Dr. Maxwell noted Plaintiff's complaint of chest pain, but found that Plaintiff had difficulty describing the pain.  (*Id.* at 505.)  Dr. Maxwell formed the impression that Plaintiff was morbidly obese, appeared "about his stated age," and that he found Plaintiff in " no acute cardiorespiratory distress."  (*Id.* at 505-06.)

A September 18, 2007 record from Dr. Gastman shows that Plaintiff was tolerating his CPAP satisfactorily and that Plaintiff was utilizing it nightly.  (AR at 486.)

In October 2007 Plaintiff had a physical residual functional capacity assessment performed. (AR at 509.)  The PRFC stated that Plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand/walk about six hours in a normal workday, sit for about six hours in a normal workday and could push and/or pull an unlimited amount.  (*Id.* at 510.)  The PRFC also shows that Plaintiff had no postural limitations other than climbing ramps/stairs and ladder/rope/scaffolds.  (*Id.* at 511.)  The PRFC also shows that Plaintiff had no manipulative limitations.  (*Id.* at 512.)  The

14

PRFC imposed moderate limitations on Plaintiff's exposure to fumes, odors, dusts, gases, and poor ventilation, and hazards.  (*Id*. at 513.)

On November 6, 2007 Pamela Herringshaw performed a psychological evaluation on Plaintiff.  (AR at 517.)  Herringshaw did not note any impairments regarding Plaintiff's mental abilities.  (*Id.*)  She stated that Plaintiff "possesses excellent intellectual abilities and memory skills." (*Id*. at 523.)

On July 14, 2008 Plaintiff saw Dr. Gina Gora for the first time. (AR at 568.)  At that initial visit, Dr. Gora recorded that Plaintiff complained of chest and abdominal pain, shortness of breath, hemoptysis, and pain on exertion.  (*Id*. at 568.)  Dr. Gora also prepared an assessment of Plaintiff's physical abilities on that first day.  (*Id*. at 565.)  She diagnosed: disseminated histoplasmosis, including chest pain; restrictive lung disease; and liver and spleen scarring; fibromediastinitis; and seizure disorder.  (*Id.*)  Dr. Gora formed the opinion that Plaintiff could lift less than ten pounds occasionally, stand or walk less than two hours per workday, and sit for less than six hours per workday.  (*Id.* at 566.)

As Defendant points out, several other records exist that appear to be from Dr. Gora.  (AR at 564.)  These records are, again at Defendant states, "largely illegible."  (Def.'s Mot. for Summ. J. at 7.)  The records show that several more tests were ordered, that Plaintiff continued to complain of chronic pain back down his right leg and reported having one seizure.  (AR at 563.)  And the records show that Plaintiff returned to the office three more times in November and December 2008 and had further testing performed and was prescribed pain medication.  (*Id*. at 560-62.)

## B.    Standards

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's

15

final decisions.   Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.      Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff was required to show that:

16

1. he was not presently engaged in substantial gainful employment; and
2. he suffered from a severe impairment; and
3. the impairment met or was medically equal to a "listed impairment;" or
4. he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  If Plaintiff's impairments prevented her from

doing her past work, the Commissioner, at step five, would consider her residual functional capacity

("RFC"), age, education and past work experience to determine if she could perform other work.

If she could not, she would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The

Commissioner has the burden of proof only on "the fifth step, proving that there is work available

in the economy that the claimant can perform." *Her*, 203 F.3d at 391.  To meet this burden, the

Commissioner must make a finding "supported by substantial evidence that [the claimant] has the

vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,*

820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form

of vocational expert testimony in response to a hypothetical question, "but only 'if the question

accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations

omitted).

### C.    Analysis

Plaintiff argues that substantial evidence did not support the ALJ's RFC and that the ALJ

did not assess the record evidence in accordance with Social Security regulations.  (Pl.'s Mot. for

Summ. J. at 1.)  Plaintiff frames his substantial evidence in terms of four issues.  He first argues that

the ALJ did not credit Dr. Gora's opinion.  If the ALJ had credited the opinion, Plaintiff argues, the

RFC used to deny him benefits would not accurately describe Plaintiff's ability to perform work.

Plaintiff next argues that the ALJ did not credit Plaintiff's complaints of pain, which would have

also changed the RFC, if they were credited.  Plaintiff then argues that the ALJ failed to factor in

17

Plaintiff's inability to pay for medical treatment. And finally, Plaintiff argues that the ALJ erred when he did not discuss Plaintiff's obesity. For the reasons discussed below, the Court recommends rejecting Plaintiff's arguments.

## 1. Substantial evidence supports the RFC

Here, substantial evidence supports the ALJ's RFC. With the exception of Dr. Gora's opinion, which the Court discusses below, no other source discussed or imposed physical limitations, save for the PRFC that was performed, which the ALJ followed. Plaintiff argues that the ALJ's RFC was improper because the ALJ did not consider Plaintiff's pain, but the ALJ did consider the allegations of pain, which the Court discusses below, as well.

The ALJ also pointed out inconsistencies in Plaintiff disability reports and his testimony. In his first function report, Plaintiff noted that his impairments did not affect his ability to do his daily activities. (AR at 145-45.) A second function report shows that Plaintiff could take out the trash and grocery shop, but in that report, Plaintiff summarily indicated that his pain limited all his physical abilities. (*Id*. at 166-68.) At the hearing, Plaintiff testified that he could not do any of the activities he stated he could do on the function reports. (*Id*. at 41-42.) The ALJ pointed out these inconsistencies and found that they supported a finding that Plaintiff was not credible. The Court agrees.

Because the Court recommends rejecting Plaintiff's arguments against the RFC and finding that no other record source opined Plaintiff's physical limitations other than in the PRFC, the Court recommends finding that substantial evidence supports the ALJ's RFC.

## 2. The ALJ appropriately noted, discussed, and rejected Dr. Gora's opinion

18

Plaintiff argues that the ALJ failed to give Dr. Gora's opinion the appropriate amount of weight. (Pl.'s Mot. at 4.) He argues that Dr. Gora was a treating physician and that, given the treating physician rule, the ALJ should have accorded her opinion controlling weight. (*Id.*) Defendant argues that Dr. Gora was not a treating physician and that the ALJ appropriately rejected her opinion.

The Commissioner of Social Security has imposed "certain standards on the treatment of medical source evidence." *Cole v. Astrue*, –F.3d–, 09-4309, 2011 WL 5456617, at *4 (6th Cir. Sept. 22, 2011) (citing 20 C.F.R. § 404.1502). Under the treating source rule, the ALJ must "give a treating source's opinion controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ does not give controlling weight to the treating source's opinion, he "must then balance the following factors to determine what weight to give it:" "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) and 20 C.F.R. § 404.1527(d)(2)).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." *Id.* (citation omitted). "Those good reasons must be 'supported by the evidence in the case record, and must be

sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (citation omitted).

19

The Sixth Circuit has "made clear" that it will remand the Commissioner's determination if it has not provided good reasons for the weight it has given to a treating physician's opinion. *Id*. at *10 (citing *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)).

If the ALJ fails to follow and agency rule or regulation, then the ALJ's failure "denotes a lack of substantial evidence, even where the [ALJ's conclusion] may be justified based upon the record." *Id*. at *3 (citation omitted). *See also Sisk v. Astrue*, 09-220, 2010 WL 3522307 at *10 (E.D.Tenn. Aug. 20, 2010) (holding that the ALJ's written decision met the goal of the treating source rule when the decision attacks the consistency of the treating source's opinion with other record evidence or the supportability of that opinion, for example, by pointing to an absence of clinical and diagnostic findings; and citing *Nelson v. Comm'r*, 195 F. App'x 462, 470-72 (6th Cir. 2006)). The ALJ must show "at least implicitly" why he "rejected" the treating source's opinion. *Id*.

Here, as Defendant points out, Dr. Gora only saw Plaintiff once before she opined his limitations–Dr. Gora therefore was not a treating physician. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (holding that the treating source rule did not apply to an alleged treating source who had only seen the plaintiff once.).

Because Dr. Gora was not a treating source, the ALJ did not have to give controlling weight to her opinion.  The Court also recommends finding that the ALJ did appropriately note, discuss, and explain why he did not credit her opinion.  Here, the ALJ pointed out that Dr. Gora's relationship with Plaintiff was very short–one visit–before she opined limitations.  The ALJ also thoroughly discussed the record evidence and explained how he came to formulate his RFC.  Even if Dr. Gora were a treating physician, the ALJ appropriately explained why he was not affording

20

controlling weight to that opinion.

The Court therefore recommends rejecting Plaintiff's argument that the ALJ failed to give the appropriate amount of credence to Dr. Gora's opinion.  (AR at 509.)

### 3.    The ALJ did not err by rejecting Plaintiff's subjective complaints of pain

Plaintiff also argues that the ALJ erred when he did not credit the extent of Plaintiff's subjective complaints.  (Pl.'s Mot. at 5-6.)  Defendant argues that the ALJ did not err and that he "carefully reviewed the evidence and reasonably concluded that Plaintiff's treatment records were not consistent with his allegations of disability."  (Def.'s Mot. at 12.)  Defendant points out that the ALJ found that Plaintiff's statements were not reliable because Plaintiff only "sporadically sought treatment and there were inconsistences in the record when he did seek treatment."  (*Id.*)  Defendant adds that the ALJ pointed out that Plaintiff's complaints also were not consistent with his reported activities.  (*Id.*)  And finally, Defendant points out Plaintiff was not compliant with treatment recommendations or he failed to seek treatment. (*Id.* at 12-13.)

The Court recommends agreeing with Defendant.  Subjective complaints of "pain or other symptoms shall not alone be conclusive evidence of disability."  *Pasco v. Comm'r*, 137 F. App'x 828, 834 (6th Cir. 2005) (citation omitted).  The Sixth Circuit has addressed how to analyze subjective complaints of pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can be reasonably be expected to produce the alleged disabling pain.

*Id*. (quoting *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  *See*

*also* 20 C.F.R. § 404.1529.[3]

Here, Plaintiff has failed to bring forth evidence confirming the severity of his pain. Dr. Maxwell noted that Plaintiff's alleged chest pain did not "seem to be causing him significant difficulty in his activities of daily living." (AR at 497.) Dr. Maxwell further noted that Plaintiff had difficulty describing the pain. (*Id.* at 505.) Dr. Maxwell formed the impression that Plaintiff was morbidly obese, appeared "about his stated age," and that he found Plaintiff in "no acute cardiorespiratory distress." (*Id.* at 505-06.) Upon examination, Dr. Rosenblat also found that Plaintiff did not appear in any discomfort and did not complaint of pain. (*Id.* at 422.) The PRFC additionally found that Plaintiff could perform light work with few limitations. (*Id.* at 509.) The Court therefore recommends finding that substantial evidence supports the ALJ's decision to not credit Plaintiff's severity allegations.

### 4.    The ALJ adequately addressed Plaintiff's lack of insurance and inability to pay for treatment

-------

[3]This regulation provides, "statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonable be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you." "We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonable be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work[.]"    20 C.F.R. § 404.1529(a).

The regulation adds, "[y]our symptoms, such as pain . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." "    20 C.F.R. § 404.1529(b)

Plaintiff also argues that the ALJ erred by not adequately addressing the argument that Plaintiff was unable to seek medical treatment because he did not have insurance to pay for it and that he was allergic to some medications. (Pl.'s Mot. at 4.) Plaintiff therefore argues that the ALJ did not comply with Social Security Ruling 96-7p. Defendant argues that the ALJ complied with the rule. The Court recommends agreeing with Defendant. Social Security Ruling 96-7p provides:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). The ruling states that one consideration is whether the individual is able to afford treatment or had access to free or low-cost medical services. *Id*. at *8. Another consideration is whether the individual did not take prescription medication because the side effects are less tolerable than the symptoms. (*Id.*)

Here, as Defendant points out the ALJ complied with the Ruling. The ALJ discussed Plaintiff's alleged inability to afford treatment and his claim that he had sporadic treatment because he lacked insurance. (AR at 21.) But the ALJ pointed out that, if Plaintiff were in as much pain as he claimed, he would have sought out intermittent or emergency treatment. (*Id.*) And the ALJ pointed out that there was no evidence that Plaintiff ever sought out low-cost or free care. (*Id.*)

Defendant further points out that Plaintiff alleged he did not follow up with treatment from Dr. Rosenblat because he was depressed, not because he lacked insurance. (AR at 436.) Defendant further points out Dr. Maxwell noted that Plaintiff was not using his medications as prescribed. (*Id*. at 487, 506.) The record does contain evidence that Plaintiff was allergic to some medications, but the record also contains evidence that Plaintiff was receiving benefits from other medications.

23

Given the ALJ's discussion of Plaintiff's arguments and the fact that no records or evidence exist that Plaintiff sought free or low-cost care and the fact that Plaintiff alleged depression as the reason why he did not seek out care (while the record indicates no such depression) and failure to use medication appropriately, the Court recommends rejecting this argument.

### 5.   The ALJ did not err when he did not explicitly discuss Plaintiff's obesity

Plaintiff argues that the ALJ when he did not explicitly discuss Plaintiff's obesity in accordance with Social Security Ruling 02-01p.[4]  Plaintiff's argument fails for several reasons.

While SSR 02-01p does suggest certain guidelines for an ALJ to follow, the Sixth Circuit has found that an ALJ does not need to explicitly "mention obesity if he credits an expert's report that considers obesity." *Coldiron v. Comm'r*, 391 F.App'x 435, 443 (6th Cir. 2010) citing *Bledsoe v. Barnhart*, 165 F.App'x 408, 412 (6th Cir. 2006).

Here, the ALJ credited Dr. Maxwell's report, which did explicitly mention that Plaintiff was obese.  This credit alone would satisfy the Sixth Circuit's precedent.

But here, Plaintiff also failed to mention obesity in any of his disability reports and even in

---

[4]"Social Security Ruling 02-01p does not mandate a particular mode of analysis, but merely directs and ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluations." *Sleight v. Comm'r*, ___F.Supp.2d___, 2012 WL 1986427, at *7 (E.D.Mich. 2012) (Michelson, Mag. J.) *adopted by* 2012 WL 1986441 (quotation marks and citations omitted).  "The Ruling details how a claimant's obesity will be considered at the various stages.  At step two, an ALJ is to 'do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.'" *Id*. (quoting SSR 02-01p, 2002 WL 34686281, at *4).  "Regarding step three, the Ruling states: 'obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing; and '[w]e may also find that obesity, by itself, is medically equivalent to a listed impairment.'" *Id*. (quoting SSR 02-01p, 2002 WL 34686281, at *5).  "Regarding a claimant's residual functional capacity, the Ruling provides: 'As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.'" *Id*. (quoting SSR 02-01p, 2002 WL 34686281, at *7).

his hearing.  That failure and subsequent only raising the ALJ's failure to discuss obesity as an issue in this Court obviates the ALJ's need to thoroughly discuss a claimant's obesity.  *See also Reynolds v. Comm'r*, 424 F.App'x 411, 416 (6th Cir. 2011) (holding that the ALJ did not err in not discussing the plaintiff's obesity when the plaintiff had not listed obesity as one of her impairments or list it as one of her difficulties on any paperwork put before the various levels of review.).

The Court therefore recommends rejecting Plaintiff's obesity argument.

### D.    Conclusion

For the above-stated reasons, the Court recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

## III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later

than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  August 6, 2012                    s/ Mona K. Majzoub
                                          MONA K. MAJZOUB
                                          UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated:  August 6, 2012                    s/ Lisa C. Bartlett
                                          Case Manager

26